THE STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

HARRY HAWORTH,

*Defendant and Appellant.*

(No. 2431; July 12th, 1949; 208 Pac. (2d) 279)

For Plaintiff and Respondent the cause was submitted on the brief of Norman B. Gray, Attorney General, John S. Miller, Deputy Attorney General, and Marion R. Smyser, Assistant Attorney General all of Cheyenne, Wyoming, and oral argument by Mr. Miller.

For Defendant and Appellant the cause was submitted on the brief and oral argument of Mr. Thomas O. Miller of Lusk, Wyoming.

240

## OPINION

RINER, Chief Justice.

This proceeding by direct appeal brings here for review a judgment of the District Court of Niobrara County entered upon the verdict of "guilty" found by a jury under an information filed by the County and Prosecuting Attorney of said county against one Harry Haworth as defendant. By that judgment he was sentenced to the State Penitentiary for a term of not less than eighteen months or more than two years.

The charge against this man was brought pursuant to the provisions of Section 9-803 W. C. S. 1945 which reads:

"Any husband who shall, without just cause, desert or wilfully neglect or refuse to provide for the support and maintenance of his wife in destitute or necessitous circumstances; or *any parent* who shall, without lawful excuse, desert or wilfully neglect to refuse to provide for the support and maintenance of his or her child or children under the age of sixteen (16) years in destitute or necessitous circumstances, .shall be guilty of a crime, and on conviction thereof, shall be punished by a fine not exceeding five hundred dollars ($500.00), or imprisonment in the county jail or state penitentiary not exceeding two (2) years, or both, with or without hard labor, in the discretion of the court." (Italics supplied).

This section with its accompaying five paragrphs, Sections 9-804 to 9-808 inclusive was enacted as the material part of Chapter 72, Laws of Wyoming 1915. Section 7 or that Chapter repealed all acts and parts of acts inconsistent with it. However, it may be noted that this law as passed by the thirteenth state legislature (1915) in its Section 1 prescribed as punishment for violation of the provisions of that section a

"fine not exceeding five hundred dollars, or imprisonment in the County jail not exceeding two years, or both, with or without hard labor, in the discretion of the court."

Section 80 of Chapter 73, Laws of Wyoming 1931 added the words "or state penitentiary" after the words "county jail" with the result that the statute now reads as set out above in Section 9-803. Thus the punishment for the offense may range according to the statute, as it at present stands, from a mere nominal or severe fine or a short or a long term in the county jail, misdemeanors, to a term in state's prison, a felony.

The information filed under the presently existing statute by the prosecuting attorney of Niobrara County, omitting formal matters, charges that the defend-

ant Harry Haworth "on the second day of September A. D. 1947 at the County of Niobrara in the State of Wyoming did wilfully and unlawfully, then and there being the father of Duane Haworth, without lawful excuse and wilfully neglect to provide for the support and maintenance of his said child who was under the age of sixteen years, to-wit, 8 years of age, and in destitute and necessitous circumstances, the said defendant being then and there able by personal service, labor and earnings to support said child, . . ."

The material for Chapter 72 aforesaid was taken, as we observe, with very slight changes in terminology from Sections 1 to 6 inclusive of the Uniform Desertion and Non Support Act. The substance of the suggested Uniform Act just referred to has been adopted, we find, with more or less alterations, in at least twenty-four states of the Union since its promulgation in 1910. Section 1 of the Uniform Act, however, omitted any designation of place or places of imprisonment and Section 4 thereof included the word "curator" following the word "guardian"; otherwise the language of the first six sections of the Uniform Act, with the exceptions above noted and that of said sections in Chapter 72, Laws of Wyoming, 1915 is practically identical.

At this point it may be well to call attention to the provisions of Section 9-806 W. C. S. 1945 (Section 4 of both Chapter 72 above mentioned and Section 4 of the Uniform Act) which read:

"Before the trial, with the consent of the defendant or at the trial, on entry of a plea of guilty, or after conviction instead of imposing the penalty hereinbefore provided, or in addition thereto, the court in its discretion, having regard to the circumstances, and to the financial ability or the earning capacity of the defendant, shall have the power to make an order, which shall be subject to change by the court from time to time, as circumstances may require, directing

the defendant to pay a certain sum periodically, for a term not exceeding two (2) years, to the wife or to the guardian, or custodian of the said minor child or children or to an organization or individual approved by the court as trustee; and shall also have the power to release the defendant from custody on probation for the period so fixed, upon his or her entering into a recognizance, with or without surety, in such sum as the court or judge thereof in vacation may order and approve. The condition of the recognizance shall be such that if the defendant shall make his or her personal appearance in the court whenever ordered to do so, and shall further comply with the terms of such order of support or of any subsequent modification thereof, then such recognizance shall be void, otherwise in full force and effect."

We may appropriately refer also to the following provisions of Section 9-807, W. C. S. 1945 (Section 5 of both Chapter 72 aforesaid and Section 5 of the Uniform Act) :

"If the court be satisfied by information and due proof under oath, that at any time during said period of two (2) years the defendant has violated the terms of such order, it may forthwith proceed with the trial of the defendant under the original charge, or sentence him or her under the original conviction, or enforce the suspended sentence, as the case may be. In case of the forfeiture of recognizance, and enforcement thereof by execution, the sum recovered may in the discretion of the court, be paid, in whole or in part, to the wife, or to the guardian, custodian or trustee of the said minor child or children."

The last sentence of Section 9-808 W. C. S. 1945 (and also Section 6 of both said Chapter 72 and Section 6 of the Uniform Act) declares that:

"Proof of the desertion of such wife, child or children in destitute or necessitous circumstances or of the neglect or refusal to provide for the support and maintenance of such wife, child or children shall be prima facie evidence that such desertion, neglect or refusal is wilful."

With so many states writing into their substantive and adjective law all or portions of the Uniform Act aforesaid, it is not surprising to find that their courts have had occasion to examine its provisions in the light of varying sets of circumstances. Each case necessarily has been adjudged upon its own facts and that must be so for the future. With profit and in aid of a proper disposition of the case at bar, we may now consider some of these decisions.

In People vs. Booth, 390 Ill. 330, 61 N. E. 2d 370 the court found it necessary to define what is meant by the words "in destitute or necessitous circumstances" appearing in the law of that state as it concerns the matter in which we are at present interested (Smith-Hurd Stats. Ch. 68, Section 24) and said:

"The part of the statute to be interpreted and applied in this case is as to the words which make the destitution of the child and its necessitous circumstances elements which must be proved to establish a case. The words 'destitute' and 'necessitous' convey the same meaning. They are used in the sense that the child is without those things essential to its health, care and education. To be more specific, they mean that the child is without some one or more of things such as medical or hospital attention, proper home, suitable care, food, clothing and reasonable facilities for educational gain. These are not suggested as all-inclusive but are mentioned as some of the factors, the proof of which would show a child to be in destitute and necessitous circumstances. They are factual conditions which are to be proved as any other fact essential to the establishment of a crime."

Where in the State of California its Penal Code, Section 270 provided that a father:

"who wilfully omits without lawful excuse to furnish necessary food, clothing, shelter or medical attendance or other remedial care for his child is guilty of a misdemeanor",

and he was convicted of a violation of this statute relative to his three minor children by his divorced wife, in People vs. Forester, 29 Cal. App. 460, 155 Pac. 1022, the appellate court reversing the judgment below said in part:

"It is admitted by the Attorney General that it should be made to appear that the father has the ability to supply what is needed or else a conviction is not supported. Indeed, it is apparent that inability without fault is a 'lawful excuse' for the failure to discharge this parental duty.

" 'While it is the duty of a parent to support his children of tender years, yet, in order that he be imprisoned for failure to obey an order of the court in connection therewith, it must affirmatively appear that he has the ability to comply with the order of the court.' In re McCandless, 17 Cal. App. 222, 119 Pac. 199.

"In that case the petitioner had been committed to the custody of the sheriff on account of his failure to make certain monthly payments directed by the superior court for the support and maintenance of his minor children. As to the question involved, though, the principle is the same. Therein is cited In re Cowden, 139 Cal. 244, 73 Pac. 156; Ex parte Cohen, 6 Cal. 319; Ex parte Rowe, 7 Cal. 175; Ex parte Silvia, 123 Cal. 293, 55 Pac. 988, 69 Am. St. Rep. 58—which are to the same effect.

"In State v. Garrison, 129 Minn. 389, 152 N. W. 762, the Supreme Court of Minnesota set aside a verdict in a prosecution for non-support for the reason that the proof failed to show the ability of the defendant to meet his obligation; the court saying:

" 'The only defense to this prosecution is his inability to perform this duty. That such inability caused by illness is a legal excuse for the failure to furnish support to a wife or children is not open to doubt.'

\* \* \* \*

"In Goddard v. State, 73 Neb. 739, 103 N. W. 443, the prosecution was under a statute penalizing wife de-

sertion and willful neglect to provide for her or for the minor children, and the Supreme Court of Nebraska held that:

" 'In such a case, in order to sustain a conviction, the state must prove that the accused is possessed of money, property, or other means available for the support of his wife, or, if he is without such means, that he has at least some earning capacity, and his refusal, without good cause, to maintain or provide for her.'

"The showing here was without conflict that the defendant did not have the ability to support his children. This was due in part to business reverses, and in part to a disability arising from an injury to his hand. It is true that he was and is a skilled dentist, but he had few patients, and was unable to serve those. He could not even pay his rent. His former wife was unable to find any property upon which to levy to satisfy a judgment in her favor. There is no evidence that defendant was willfully idle, or that he was prodigal in his expenditures. There is no just ground for the inference that his financial embarrassment was the result of artifice or any design to deprive his children of the attention and support to which they were entitled. Deliberate and fraudulent inability would, of course, be considered unavailing as a defense to the charge. We are not, however, at liberty to infer that appellant was not acting in good faith. True, another marriage and the birth of another child added to his burdens; but this consideration involves nothing culpable or even immoral. It rather suggests a reason why care should be exercised in applying the severe penalty of a statute which, as suggested by appellant, is 'intended to prevent destitution and not to produce hardship in or destruction of the home.' "

In this case too it appeared that the children had "been cared for and all their wants supplied by their grand parents."

See also People vs. Smith, 38 Cal. App. 175, 175 Pac. 696 where also a father was convicted for failure to provide for his minor child under said Section 270 of

the Penal Code quoted above and the judgment was reversed, the court saying:

"Furthermore, the evidence shows that defendant worked whenever he could obtain employment and was able to work, and also that he searched for employment without success. It cannot be said, therefore, that his impecuniousness was chargeable to indolence, nor is there evidence that he was guilty of any misconduct which prevented better results. If a defendant, without fault, is financially unable to support his minor child with the necessaries of life, he cannot, of course, be justly charged with willful failure in that respect. In re McCandless, 17 Cal. App. 222, 119 Pac. 199; People v. Turner, 29 Cal. App. 193, 156 Pac. 381; People v. Forester, 29 Cal. App. 460, 155 Pac. 1022.

"The only possible answer to this position is that he should have devoted his meagre income to his child rather than to have used it for the payment of his debts. There would be force in this contention if the child had been in need of the necessaries of life. But as it was receiving from its mother all that it required for its support and comfort, we think the father's conduct under the circumstances should not be characterized and denounced as felonious."

Another still later case from the same jurisdiction and involving the same law we find to be instructive. In People vs. Wallach, 62 Cal. App. 385, 390, 393, 217 Pac. 81, the court discussing the character of the offense charged pointed out that:

"A prosecution under section 270 of the Penal Code is, necessarily, for a continuing offense. Failure to provide upon one day or another day is not the evil aimed at by the statute. It is the continuing offense, the failure to provide for a substantial length of time, without legal excuse, which constitutes this offense. The instructions and ruling of the trial court that this was a continuing offense were correct. (People v. Stanley, 33 Cal. App. 624, 626 (166 Pac. 596)."

In this case, too, a conviction of the defendant was reversed. The Attorney General, dissatisfied with the

result reached in the matter filed a petition for a rehearing. Denying this, the court further said inter alia that:

"The section of the Penal Code under which defendant was prosecuted (section 270) provides: 'A parent of . . . a minor child who *willfully* omits, *without lawful excuse* to furnish necessary food, etc. . . .' To say that the willfulness of the act is inferred from evidence of failure to provide does not touch the question discussed by the opinion in this case, which is that, regardless of the fact that defendant's willful failure to provide may have been shown, the evidence discloses facts which, under the decisions of this state, might constitute a lawful excuse. The prosecution must prove not only that there was a willful failure to provide, but that there was no lawful excuse for the omission.

(People v. Smith, 38 Cal. App. 176 (175 Pac. 696).

This latter element is an important part of the statute. It is not the purpose of the statute to punish a father for failure to perform his duty as such, but to secure to minor children necessary food, clothing, and shelter. (People v. Clarke, 51 Cal. App. 473 (201 Pac. 465).

"It was because it appeared to us, for the reasons just stated, that section 270e of the Penal Code was not applicable to the questions presented in this case, that said section was not discussed in the opinion.

"Respondent complains that many of the facts recited in the opinion are taken from the testimony of the defendant. This was because that testimony, in our opinion, stands uncontradicted in the record and must be given its full value. As we have stated, respondent urges that the *prima facie* case made by section 270e of the Penal Code is sufficient to raise a conflict with the defendant's testimony and justify the verdict, but, as we have just pointed out, section 270e of the Penal Code has no effect in providing proof that defendant's failure to provide for his child was without lawful excuse and it was to this point that the defense was directed."

That part of Section 270e of the Penal Code mentioned in the opinion as above reads:

"Proof of the abandonment and non-support of a wife, or of the omission to furnish necessary food, clothing, shelter, or of medical attendance for a child or children is prima facie evidence that such abandonment and non-support or omission to furnish necessary food, clothing, shelter or medical attendance is willful."

Compare Section 9-808 W. C. S. 1945 quoted supra. We observe that the Supreme Court of California declined to interfere with the judgment of the subordinate appellate court.

In State vs. Tucker, 151 Wash. 218, 275 Pac. 558 that portion of Rem. Comp. Stats., Section 6908 so far as pertinent here provided that "every person who . . .

"willfully omits, without lawful excuse, to furnish necessary food, clothing, shelter, or medical attendance for his or her child or children or ward or wards; * * *

"Shall be guilty of a gross misdemeanor."

And Section 6910 of the same compilation enacts that the omission to furnish necessary support is prima facie evidence that such conduct was wilful. Under these statutory provisions, Tucker was convicted of neglecting and refusing to support a minor son. The mother of the boy, and Tucker had been divorced some years previously. Reversing the judgment below and referring to the defendant's defense in the case, the court said:

"His sole defense before the jury was that of inability, because of misfortune and ill health, to earn enough to sustain himself and advance, for the child's support, any more than he did.

"This was a proper defense to overcome the statutory presumption of wilful misconduct."

Section 249 of the Penal Code of 1913 of the State of Arizona enacted that:

"A parent who willfully omits, without lawful excuse, to furnish necessary food, clothing, shelter or medical attendance for his or her minor child is guilty of a felony."

In Branham vs. State, 33 Ariz. 170, 263 Pac. 1 the defendant Branham was convicted of violating the provisions of the above quoted statute. Reversing the judgment of the trial court and discussing the requirements of the statute involved, which, it was pointed out, was borrowed from the State of California, the court said:

"Before a parent may be punished as a felon for omitting to furnish necessaries to his child, it must appear that such omission was willful and without lawful excuse. The element of intention is present if the omission is made purposely or willingly. Subdivision 1, § 7, Pen. Code 1913. If the omission is not intentional or willing, but the result of conditions and circumstances over which the parent has no control, there is absent a very material ingredient of the crime defined in section 249. It is also apparent that it was intended by said statute to exempt a parent from criminal punishment even though under some circumstances the omission was willingly made. In other words, a willful omission will excuse the parent if the excuse is a lawful one. An omission to furnish food, clothing, shelter or medical attendance to his child is never willful if the parent, after an honest effort, in good faith, is unable to furnish them. If he is without property or means and is dependent upon what he may be able to earn, and the evidence shows a willingness on his part to work but inability to secure remunerative employment, or if he becomes sick and unable to work, or if afflicted with physical defects that prevent his obtaining work, a showing to that effect will, under all the decisions, excuse him for omitting and failing to furnish his child the enumerated necessaries." (Citing cases).

It appeared in the foregoing case that the defendant was totally blind in one eye due to the explosion of a dynamite cap and had lost three fingers on one of his hands. Otherwise he was able bodied and capable of doing some kinds of common labor but nothing else. Reviewing generally the evidence in the case the court remarked:

"It does not appear therefrom that defendant's children wanted in the common and ordinary necessaries of food or clothing, or that they were not comfortably and sanitarily housed, or furnished all needed medical attention, but it does appear that these things have not been supplied wholly by defendant. Some of them the mother furnished; it may be the greater part came from her. The baby, Nellie Louise, was entirely taken care of by her mother. The other four children, before the divorce and afterwards, lived with defendant and his mother, and, although the decree of divorce gave their custody to their mother, no change was made. James Wesley, we judge from the record, was still with the grandmother at the time of the trial.

"The defendant's statement of his contributions toward the support of his children is uncontradicted, and if true they were substantial, considering his condition and circumstances. His story as to the efforts he made to secure employment is not only undisputed, but abundantly corroborated. Upon a citation to show cause why he should not be punished for failure to pay monthly alimony his inability to do so would have been a lawful excuse. In re McCandless, 17 Cal. App. 222, 119 P. 199. In this case it was said:

" 'While it is the duty of a parent to support children of tender years, that he be imprisoned on account of the failure to obey an order of the court in connection therewith, it most affirmatively appear that he has the ability to comply with the order of the court.'

"If the showing made would be a defense in such a proceeding, it would seem it should be sufficient in a criminal prosecution such as this. It was not shown that defendant wasted or foolishly spent his earnings.

So far as the record shows, his habits are good. There is no intimation that he is addicted to strong drink, or that he gambles, or that his associates were evil."

The court's conclusion in the matter is put in this language:

"We think the state failed to make out its case. According to the record, defendant did not willfully omit, without lawful excuse, to furnish the enumerated necessaries to his children, but furnished such necessaries to the extent of his ability."

The case of State vs. Bess, 44 Utah 39, 137 Pac. 829 arose under a statute phrased in many respects quite like our Section 9-803 supra being Session Laws of Utah 1911, Ch. 105, Section 1 which reads:

"Any person who shall without just excuse, desert or willfully neglect or refuse to provide for the support and maintenance of his or her minor child or children under the age of sixteen years, in destitute or necessitous circumstances, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than three hundred dollars, or by imprisonment in the county jail at hard labor for not more than six months, or by both such fine and imprisonment."

The information filed against the defendant in that case was described by the court thus: That he

"on the 1st day of August, 1911, and continuously thereafter until the filing of the information (December 27, 1911), willfully neglected and refused, without just cause or excuse, to provide for the support and maintenance of Leona May Bess, aged 13 years, Inez Bess, aged 8 years, and Eva Bess, aged 5 years, he being then and there the father of said children, all of whom, it is alleged in the information, were in destitute and necessitous circumstances."

It appeared that the family had been broken up by a divorce decree whereby the custody of two of the children, boys, had been awarded to the father and

four of them, girls, had been given to the mother. The children named in the information as above set forth were shown by undisputed evidence to have actually suffered because they were not supplied with the common necessaries of life.

Commenting on the purport and proper construction of the evidence in the case, a reversal of the judgment of conviction was ordered, the court saying:

"We are of the opinion, however, that the evidence fails to show such willful dereliction on the part of the defendant in failing to provide for the support and maintenance of the children as would make him amenable to the penal statute under which he was prosecuted. It will be noticed that the undisputed evidence shows that during the time covered by the information the current and necessary expenses of the defendant and the two boys, whose custody was awarded to him by the decree, far exceeded his earnings. It was not contended, or even suggested, that defendant, during the time mentioned, willfully or otherwise remained idle when he could have obtained employment; nor is it contended or suggested that he spent or wasted any part of the money earned by him in dissipation or riotous living. In fact the evidence affirmatively shows that defendant is not addicted to the use of tobacco or spirituous liquors, and does not gamble. We think the evidence wholly fails to show willful neglect on his part as contemplated by the statute to provide for and support the children mentioned in the information. True, evidence was introduced showing that he failed to contribute anything for their support; but the evidence also shows that the current and necessary expenses of himself and two boys far exceeded his earnings during the time covered by the information, hence his neglect in that regard was not without 'just excuse.' "

\* \* \* \*

"The evidence for the state does show that after the filing of the information, and about six weeks before the cause came on for trial, the defendant, by order of the court, paid Mrs. Bess $10. It is therefore ap-

parent that supplementary proceedings under the decree of divorce are much more effective in securing to Mrs. Bess and the children their legal rights than is the prosecution of the defendant in a criminal action. In supplementary proceedings the element of 'destitute and necessitous circumstances' on the part of the children, of 'willful neglect' without 'just excuse' on the part of the defendant to provide for their support and maintenance, is not essential in order to authorize the court to compel him to pay the alimony awarded by the decree, whereas in criminal proceedings it must be established by the evidence beyond a reasonable doubt that the children were in destitute and necessitous circumstances, and that the defendant without just excuse willfully neglected and refused to provide for their support and maintenance, before the defendant can be legally convicted. The defendant's request for a directed verdict in his favor should have been granted.

"We think the record clearly shows that the defendant cannot, under any theory of the case, be legally convicted of the crime charged in the information."

A concurring opinion was filed by one of the associate justices in which the following forceful language appears:

"But, as is said by the CHIEF JUSTICE, Mr. Bess, in his struggle to obtain the means of support, could hardly obtain sufficient for the two boys and himself, and was utterly unable to provide means for the mother or the girls. In view of this, it would be a somewhat peculiar administration of the law in question, to say the least, if it should be held that Mr. Bess should be punished for what he was utterly unable to prevent. Moreover, to imprison him could result only in depriving the little boys of their means of support. Such a result would be more or less tragic for them, to say the least. Would either the county, the state, or any one else, not excluding the mother and the four girls, be benefited by his imprisonment, and thus make the little boys also objects of charity, as it is contended is the case with the little girls? I think not. While the law

in question is salutary, it nevertheless is of that character which requires it to be administered with some care so as to not produce more mischief by its enforcement in certain cases than can be prevented thereby. The law only punishes for a willful neglect of duty imposed by it, and the evidence is wholly insufficient to sustain a finding to that effect. I thoroughly agree with the comments of the CHIEF JUSTICE relative to the duty of a parent to provide for his children, but where it appears, as it does in this case, that the parent is unable to discharge such duty, it would be a travesty of justice to punish him."

Supplementing the foregoing decisions we find that well known legal texts have announced similar views: 39 Am. Jur. 769, Section 109 states that:

"as a general rule, the refusal, neglect, or failure of a parent to provide for his child is not criminal under the desertion and nonsupport statutes where it is due to inability rather than to wilfulness or negligence, since, it is said, the parent is not required to do the impossible."

And 46 C. J. 1353, Section 213 asserts that:

"where a parent, without fault on his part, is physically or financially unable to support his minor child, such inability furnishes a lawful excuse for his failure or neglect, and he cannot be charged with willful failure or neglect in that respect,"

\*   \*   \*   \*

"A father's financial inability will furnish a lawful excuse for his failure to support his child, where it arises from his physical inability to work."

We now refer to the evidence in the case at bar somewhat at length. The defendant did not go on the witness stand and presented no evidence. His counsel submitted two motions for a directed verdict as hereinafter mentioned.

The substance of the State's case was presented by its witnesses as follows:

Bertha Hall testified: that she lives with her daughter Naomi Haworth in Lusk; that she is a widow and has no income; that she stays with and takes care of Duane Haworth who is the son of her daughter and the defendant; that her daughter has no source of income except wages; that she does not pay her mother anything for the work she does in the home; that her daughter received a check for $20 from the defendant a few weeks before the trial which occurred on February 25, 1948.

Naomi Haworth testified that she lives in Lusk, in Niobrara County having lived there continuously since July, 1947; that she is divorced from Harry Haworth, the father of her child, Duane Haworth, the father being the defendant herein; that she has no source of income except a weekly check from the telephone office where she works; that her check averages about $33.50 a week; that she pays $30 a month rent with that money, $5.50 for lights and water, between $12 and $14 a week for groceries and keeps up two policies of insurance for the boy; that she gives her mother a home who keeps the child in school and takes care of the home; that witness buys some of the boy's clothing and her family, her brothers and sisters contribute some; that she has paid the boy's dental and medical expenses, the amounts of these not being given; that four or five months after the divorce which was the last day of August, 1943, Mrs. Haworth received checks from the defendant through January until February, 1944; that she did not receive any more until he went into the Navy Sea Bees; that he was in that service nine months and after that she did not receive anything; that for those nine months she received $50 each month for their two children; that defendant came back from the service about two months before the oldest boy was drowned in June, 1946; that defendant remarried since he and she were divorced; that her son Duane

has been with her continually except during Christmas week when he went down to Wheatland, Wyoming to visit his father; that from July 26, 1947 the child Duane had no means of support other than what Mrs. Haworth gave him and except what her brothers did where he stayed several weeks until her mother came; that she has repeatedly called upon the defendant for aid to support the child; that before school started she wrote a letter and told what Duane needed for school clothing and he wrote and said he couldn't get it all at once but that he would get them as he could and she wrote back and he did not answer; that defendant has told Mrs. Haworth that he makes about $165 a month. During what period these wages prevailed is not stated.

On cross examination the same witness said that the divorce decree issued by the District Court of Sioux County Nebraska has never been amended or changed in any way; that under that decree Mrs. Haworth was given the care, custody, control and education of the children.

Cecelia Jordan testified that she lives in Cheyenne, Wyoming; that she was married to the defendant but was divorced the 18th of August, 1947 having moved to Wyoming in August of 1946; that the defendant was not at that time employed; that the latter part of September, 1946 he started working for the Milton Transfer with wages of $35 a week; that after he left the Milton Transport he worked about a month for some people in Milwaukee transporting from coast to coast; that he left the employ of Milton in February, 1947; that he was unemployed for a time, the reason being that his back bothers him a lot; that he really is not supposed to be driving trucks anyway or to do strenuous work; that in June, 1947 the job for the Milwaukee people ended; that the final divorce decree between her and the defendant was dated the 18th of August, 1947;

that he was living in the State of Wyoming all of that time; that she worked all the time they were married, her work being "beauty work."

On cross examination this witness also stated that she and the defendant were married July 12, 1944; that defendant's physical condition was: When he was younger a horse fell on him and injured his back and crushed two vertabrae, the two lower, and broke his hip but he had never gone to a doctor; that in 1944 witness took him to two bone specialists, one in Hot Springs who said that defendant would have to have an operation but that the doctor had no assistant so he couldn't operate; that consequently she and defendant went on to Omaha and instead of operating the doctors there stretched his back as much as the vertabrae could be separated and put him in a cast and gave him orders he shouldn't work because it caused sort of a paralysis; that his hip had been broken and healed over and that in order to do anything for that they would have to operate and break the bone over again, which they were afraid to do for fear of complications with the result that his back is about like it was; that they thought by wearing a cast the cartilages would build up and it wouldn't bother him but he still has to wear a brace so it is hard to do any strenuous work.

This witness further stated that the defendant has ninth grade education; that driving a truck is about all the employment he has had; that he is not qualified by education or experience in any particular line; that he is not lazy; that he has tried and tries to work; that from the time they were married in July, 1944 up to August, 1947 he supplied clothing for his two sons; that for three months after they they were married he couldn't work because of his back; that after they moved to Crawford, Nebraska he worked for six

months for one Robinson though it may not have been that long and then he went into the service; that while he was in the service he drew about $150 a month after all deductions were taken out; that she and defendant had to pay $60 a month for rent; $25 a month for his clothing, $50 or $60 a month for groceries; that defendant's back bothered him up to the last time witness talked to him about his health.

On re-direct examination the same witness stated that she did not buy the clothing for his sons but selected it; that defendant bought shoes and overalls for his sons; that these were purchased at various times before witness and defendant moved to Crawford and Harrison, Nebraska, that this was in August just before we moved to Wyoming in 1944; that he bought shoes in Harrison, Nebraska for the two boys and some at Crawford, Nebraska, also boys' sweaters and under clothes and slacks; that this was done four or five times; that he bought coats and snow suits for the boys after Christmas in 1945; that Naomi Haworth, the complaining witness herein, came down and told defendant the boys needed clothes so he went up and bought $62 worth of clothes and she and her then husband, Harry Haworth, brought them up to the children; that the sweaters cost $4 apiece; that defendant bought two yellow and blue and two brown and green sweaters also underwear and socks, two or three pair apiece for the boys; that the two snow suits for the boys cost $23 apiece; that it was the turn of the year 1944-1945 that the snow suits were bought for the children and after the first of the year underwear and other things were purchased; that before defendant went into the service he bought some summer clothes, sweat shirts, socks and underwear, a few weeks before going to Denver and sent her $20; that $50 a month was paid Naomi while he was in the service; that it was agreed between Naomi and the defendant that he pay $300 at

the time of the older child's funeral and it was agreed between them that this was to go on the support; that defendant gave Naomi $75 after that which sum he had to borrow.

Naomi Haworth recalled for further examination testified that she lived in Wyoming all but ten months since September, 1944, coming to Wyoming for the first time in that month; that both of her sons were with her then; that her son Duane has been in Wyoming since September 16, 1946; that at Christmas time in 1944 defendant sent the boys snow suits and sent each a sweater in February, 1945; that in 1945 before school was out defendant brought up more clothes for the boy, some of which did not fit but which were not exchanged; that those are the only times defendant bought clothes for the children; that the boy Duane was eight years old in September, 1947; that witness knows defendant hurt his back but it never seemed to hinder his riding horses and he never went to a doctor to do anything about it; that the only time witness knew it was as bad as it was was in 1944 when he went to Omaha; that he was qualified to do ranch work; that witness used the $75 defendant gave her to pay additional expenses in connection with the oldest boy's funeral, also she made a payment on a house; that there was no other time defendant sent her money up to September 2, 1947; that she had to borrow from her brother on several occasions to buy winter coats for her and for the child.

After the State rested its case, the defendant's counsel moved for a directed verdict in his favor on several grounds; one being the alleged failure of the State to prove the venue in the cause and the other:

"That the State has failed to prove that this defendant wilfully and unlawfully and without lawful excuse deserted and wilfully neglected to provide for the support

and maintenance of his child in destitute and necessitous circumstances. The State has further not proven that this defendant is able by personal service, labor and earnings to support said child; that the State has failed to show in any way that this defendant is guilty of the charge contained in the Information."

After argument by counsel for both parties the court ruled:

"Mr. Watt, this man is presumed to be innocent until proven guilty. It is necessary for you to prove every allegation of this Information. I think it is necessary for you to show that the defendant was then and there able by personal earnings to support the child. This defendant doesn't have to prove anything; you have to prove all of the material allegations. He doesn't have to take the stand."

Leave was then asked by County Attorney to re-open the case and this leave was granted. Naomi Haworth as a witness then testified that in the month of August, 1947 Duane needed clothes to start school so she made an order to Montgomery Ward for what he needed in the amount of $35; that he wrote back that as soon as he got a pay check he would buy what he needed the worst; that witness told defendant what the child needed to start to school, winter clothes and overshoes; that she received this letter in response to hers some time in August or September before school started; that she never received the clothes; that at Christmas time when he came up to get the child who went to stay with his father over the Christmas week, clothes were mentioned then and she hadn't washed and his clothes were not all clean; that defendant said not to send any more and he would buy more when he was down there but he didn't do that; that she did not specifically talk to defendant about his earnings regarding the period of time from July 26, 1947 to September 2, 1947.

Upon the conclusion of the foregoing testimony on recall and on leave to the State to re-open its case,

with the testimony of the County Superintendent of Schools that school started in Lusk in the fall of 1947 on September 2, the State again rested its case and counsel for defendant again renewed his motion for a directed verdict which was denied by the court and exception reserved to the ruling.

The divorce decree between Naomi and Harry Haworth was not offered in evidence.

Tested by the decisions and authorities above reviewed we are unable to say that under the foregoing resume of the evidence, the State proved its charge as alleged in the information against the defendant.

The evidence discloses nothing as to the contents of the divorce decree given in Sioux County, Nebraska which broke up the family other than that the custody of the children was awarded to the mother, Naomi Haworth, and that the decree has apparently never been changed or altered. It appears that Mrs. Haworth for some four or five months after the divorce decree was rendered, received checks from her former husband and these were sent or given her until February, 1944. She says she received nothing after that until he went into the Navy Sea Bees. The amount of these checks she received from him is not stated. For all that appears in this record the sums of money sent her during those months might have been ample to support, and could have supported the children until the defendant went into the service of the United States in July, 1945.

He married Cecelia Jordan in July, 1944. For three months after that he was unable to work on account of injuries to his spine and hips incurred previously and for which he now constantly has been compelled to wear a brace. His physicians have advised him not to attempt strenuous work. When he was driving a truck, work

he was not supposed to do, he earned not more than thirty-five dollars per week, employment which was only temporary in character. The expenses of his household during his second marriage at that time apparently took about all his earnings. Yet his second wife testifies to many instances where clothing, shoes and wearing apparel of different kinds were purchased by defendant and given to the children; also that the defendant sent his first wife a check for twenty dollars just before he went into the Naval Service.

There is affirmative proof that he is not lazy and that he tries to work. There is no proof at all in the record that he has been addicted to drunkenness or gambling or that he has tried to avoid employment he was capable of performing when such employment was offered him. The only time he had a steady job was when he was in the United States Government Naval Service already mentioned. At that time he had the obligations of a second marriage to meet yet it is conceded that during all that nine months' period fifty dollars per month was sent to the first wife for the benefit of the children. Whether all of that money was used by her for the children's support does not appear.

At the time the oldest child was drowned and after the funeral he borrowed seventy-five dollars which he gave to his first wife. She used part of that for funeral expenses and with part of it made a payment on a house. She earns thirty-three dollars and fifty cents a week as an employee of a telephone company and gives her mother a home besides. The defendant has taken care of the child, Duane, over the Christmas holidays. All in all he seems so far as the record before us shows to have done the best he could for his children considering his ability to earn money, his physical handicaps, his meager schooling with no training for any vocation aside from manual labor. Under a fair construction of

the statute involved and in the light of the authorities we have above reviewed, we think that the State's evidence discloses the defendant had lawful excuse for not doing more than he did, in other words that he did the best he could under the circumstances.

Indeed the trial court seems to have taken the same view of the matter after hearing argument by counsel for both parties upon the defendant's first motion to direct a verdict in his favor. We have noted that the County Attorney was at that time told by the court that the State must prove that the defendant was "able by personal earnings to support the child" and that the defendant did not have to take the witness stand. The prosecuting officer acquiesced in this ruling asking leave to re-open the State's case. The district court accorded him this privilege. Thereupon it was sought to be proven for the State that from July 26, 1947 until September 2, 1947 the defendant had "without lawful excuse" by "personal services, labor, and earnings" failed to support his child, Duane Haworth.

We think the State entirely failed to make such proof. True, his first wife says she wrote defendant in August, 1947 that Duane needed certain clothes in which to go to school and these she listed in a Montgomery Ward order blank which was sent him; that defendant wrote in reply that as soon as he got a pay check "he would buy what he needed the worst" but nothing was done. However, there was no proof that during that period the defendant was either employed at all or employed at a wage that would enable him to meet this request of the child's mother or that he was during the same period physically able to work. It seems to us it was vital that such proofs be forthcoming.

The trial court in Instruction No. 5 to which no objection or exception was interposed, told the jury that:

"with respect to the phrase 'destitute and necessitous circumstances' that 'destitute' means 'not possessing the necessaries of life; condition of extreme want; without possession of resources.' That the word 'necessitous' means 'living in or characterized by poverty; needy.' "

These facts the jury, by preceding instructions given by the court, were advised the State must prove in order to make out a case. We are obliged to say that we entertain grave doubts that such proof was made. Under the statute, Section 9-803, Naomi Haworth was, as well as her former husband, obligated to do what she could in taking care of the child placed in her custody by the divorce decree. She at times, seems to have turned the care of the children over to some of her relatives. What proportion of the expense of the children in her custody should be born by either parent is not clear. It may be that the divorce decree would supply information on that point but if so, as already pointed out, it is not in this record. At any rate so far as we can tell from this record, the children seem at all times to have been reasonably well taken care of.

In this state as in the State of Iowa by statute (See § 58-110 W. C. S. 1945) the parents of a child are under the same legal duty to support it. As said in Addy vs. Addy, — Iowa —, 36 N. W. 2d 352: In determining the amount the defendant father should contribute for the support of child "the proper inquiry is as to the child's need and the ability of each parent to furnish means for its support." See also State vs. Ungry — Iowa —, 33 N. W. 2d 381.

Recurring again to the provisions of the Desertion and Non-Support Act as it appears in our statutes as Sections 9-806 and 9-807 which were quoted in full above, we are constrained to say that more could, we think, be accomplished in carrying out the real purpose of the act, i.e., to compel parents to take care of their

offspring to the extent of their physical ability and the means at their command, by invoking the provisions of those sections which are far more flexible and designed to accomplish equitable results for all parties concerned than are the hard and fast rules of the criminal law which must control if the severe penalties of Section 9-803 are pressed to the limit. In our judgment if such penalties are sought to be used they should be employed only when other methods of disposing of matters of this character have failed and only in extreme cases of which the case at bar is not one. To incarcerate a parent in the State Penitentiary depriving him or her of his or her liberty as well as citizenship irrevocably stains both parent and child and certainly takes from the child for a time at least any chance at all of receiving support from those who should provide it. See State vs. Bess, supra.

Other points have been suggested for reversal of the judgment and argued by counsel for the parties but as they are not likely to arise again we refrain from discussing them. There is no merit in defendant's contention that the venue of the offense was not proven. The residence of the mother and child involved was established in Niobrara County on September 2, 1947 and for many months before that date. It has been held that:

"A parent may be guilty of, and prosecuted for, the crime of failing to provide for his minor children, although he is a resident of another state during the time laid in the indictment;" 46 C. J. 1357, Section 220 and cases cited.

The judgment of the district court of Niobrara County is accordingly reversed and the cause remanded for a new trial consonant with the views hereinabove expressed.

*Reversed and Remanded.*

KIMBALL, J. and BLUME, J. concur.